Corliss LAMONT; Isaac Asimov; Balfour Brickner, Rabbi; Augusta P. Finkelstein; Florence Flast; Bruce Southworth, Reverend; Nina Untermyer; Americans for Religious Liberty, Inc., Plaintiffs–Appellees,

v.

Alan WOODS, as Director of the Agency for International Development, Department of State; David Santos, Director of the Office of American Schools and Hospitals Abroad, Department of State, Defendants–Appellants.

No. 1145, Docket 90–6311.

United States Court of Appeals,
Second Circuit.

Argued March 1, 1991.

Decided Sept. 26, 1991.

Bernard W. Bell, New York City (Otto G. Obermaier, U.S. Atty., S.D.N.Y., Edward T.

Ferguson, III, of counsel), for defendants-appellants.

Herman Schwartz, Washington, D.C. (C. Edwin Baker, John A. Powell, American Civil Liberties Union Foundation, New York City, of counsel), for plaintiffs-appellees.

Before OAKES, Chief Judge, CARDAMONE and WALKER, Circuit Judges.

OAKES, Chief Judge:

Aristotle once observed that to give money away is an easy matter and in any man's power, but to decide to whom to give it, for what purpose and how, is neither in every man's power nor an easy matter.[1] The observation remains true to this day, as this case illustrates.

This is a federal taxpayers' Establishment Clause challenge to the appropriation and expenditure of public funds by the United States for the construction, maintenance and operation of foreign religious schools. Defendants sought summary judgment on three independent legal grounds: (1) that plaintiffs lacked standing to sue; (2) that plaintiffs' claims raised nonjusticiable political questions; and (3) that the Establishment Clause did not apply to the government's activities in foreign countries. The United States District Court for the Southern District of New York, Leonard B. Sand, *Judge*, denied defendants' motion for summary judgment, but certified the three potentially dispositive issues raised by defendants for immediate appellate review under 28 U.S.C. § 1292(b). We accepted review, and now affirm the judgment of the district court.

## BACKGROUND

### 1. *The ASHA Program*

The Foreign Assistance Act of 1961, Pub.L. No. 87–195, 75 Stat. 424 (codified as amended at 22 U.S.C. §§ 2151–2429), was initiated to encourage and assist the people of developing countries "to acquire the knowledge and resources essential to devel-

---

**1.** Aristotle, *Nichomachean Ethics*, bk. 2, ch. 9.

828

opment and to build the economic, political, and social institutions which will improve the quality of their lives." 22 U.S.C. § 2151 (1988). The American Schools and Hospitals Abroad ("ASHA") program is one of the many foreign aid programs established by the Foreign Assistance Act. *See id.* § 2174. Under the ASHA program, the President is authorized "to furnish assistance, on such terms and conditions as he may specify, to schools ... outside the United States founded or sponsored by United States citizens and serving as study and demonstration centers for ideas and practices of the United States." *Id.* § 2174(a). The ASHA program is administered by the Agency for International Development ("AID") through the Office of American Schools and Hospitals Abroad (the "ASHA Office"), and under the policy guidance of the Secretary of State. *Id.* § 2151(b).

ASHA grants are not made directly to foreign schools. Rather, grants are made to individuals or organizations in the United States for the benefit of specific foreign schools. The United States sponsors are then responsible for transferring the funds overseas. AID addresses any concerns or information regarding grants to the United States sponsors, and has virtually no direct contact with the foreign affiliates.

It is the job of the ASHA Office to solicit and review grant applications from would-be United States sponsors, and recommend deserving applicants to AID's administrator, who is responsible for all final decisions. In evaluating applications, the ASHA Office is guided by a number of criteria pertaining to prospective grantees and their sponsors. *See* 44 Fed.Reg. 67,543 (1979). For example, sponsors "must demonstrate a continuing supportive relationship" with the schools for which they seek assistance, as by providing them with financial and management support. *Id.* at 67,544 (criterion 1). The schools themselves must be centers for American educational ideas and practices, with programs of study that reflect favorably on and increase understanding of the United States. *Id.* (criteria 2 & 3). While they should be staffed largely by United States citizens or persons trained in the United States, they must be attended predominantly by citizens of countries other than the United States. *Id.* (criteria 5 & 6). More important for purposes of this lawsuit, ASHA-assisted schools "must be open to all persons regardless of race, *religion,* sex, color or national origin." *Id.* (criterion 8) (emphasis added). While this criterion does not bar religiously affiliated or even pervasively sectarian schools from participating in the program, it does proscribe the use of ASHA grants "to train persons for religious pursuits or to construct buildings or other facilities intended for worship or religious instruction." *Id.*

## 2. *The District Court Proceedings*

In this action, plaintiffs Corliss Lamont, Isaac Asimov, Balfour Bruckner, Augusta Finkelstein, Florence Flast, Bruce Southworth, Nina Untermyer and Americans for Religious Liberty, Inc. sue Alan Woods, Director for AID, and David Santos, Director of the ASHA Office. Plaintiffs challenge the defendants' funding of twenty foreign schools that have received one or more grants under the ASHA program since fiscal year 1983. In particular, plaintiffs challenge grants to eleven Israeli schools and to nine schools affiliated with Roman Catholic religious orders and located in the Philippines, Egypt, Jamaica, Micronesia and South Korea. These institutions, both secondary schools and universities, are affiliated with United States sponsors of either the Jewish or Catholic faith. Plaintiffs contend that all twenty schools are pervasively sectarian, and that financial assistance to these schools under the ASHA program therefore violates the Establishment Clause.

Plaintiffs commenced this action on February 1, 1988, and filed a second amended complaint on February 22, 1988. On March 4, 1988, defendants moved to dismiss the second amended complaint on the ground that plaintiffs lacked standing. The district court denied this motion on April 6, 1988. Following discovery, the parties cross-moved for summary judgment. In their motion, defendants reasserted that

plaintiffs lacked standing, and argued further that the case raised nonjusticiable political questions, and that the Establishment Clause does not apply to the Government's foreign activities.

On October 2, 1990, in a thoughtful and well-reasoned opinion, Judge Sand denied both parties' motions for summary judgment. *Lamont v. Schultz,* 748 F.Supp. 1043 (S.D.N.Y.1990). First, the court held that plaintiffs have standing as federal taxpayers to maintain this action, relying primarily on *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) and *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988). *See* 748 F.Supp. at 1047–48. Second, the court found that, given the "strong nexus" between the United States sponsors and the foreign schools, the claims asserted were not barred by the political question doctrine. *Id.* at 1049. Third, the court concluded that "domestic Establishment Clause standards are applicable to the ASHA program." *Id.* at 1052. Having decided these threshold questions, the court went on to consider whether the challenged ASHA grants violated traditional Establishment Clause standards, but determined that there were disputed factual issues precluding resolution of the case on a summary judgment motion. Specifically, the court found that "[i]n all twenty of the challenged schools, [the parties] disagree on most of the factors that determine the nature of an institution which dictates whether it is pervasively sectarian" within the meaning of *Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971). 748 F.Supp. at 1055.

Because the threshold questions in this action involved "controlling question[s] of law as to which there is substantial ground for difference of opinion," 28 U.S.C. § 1292(b) (1988), the district court certified all three questions to this Court for immediate appellate review. *See* 748 F.Supp. at 1057. On October 12, 1990, defendants petitioned this Court for permission to appeal pursuant to 28 U.S.C. § 1292(b). By order dated November 21, 1990, we granted defendants' petition. We now affirm.

**DISCUSSION**

*1. Standing*

■ The doctrine of standing incorporates constitutional and prudential limitations on federal court jurisdiction, both of which are " 'founded in concern about the proper—and properly limited—role of the courts in a democratic society.' " *Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (quoting *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2204–05, 45 L.Ed.2d 343 (1975)). At a minimum, Article III of the Constitution requires a party seeking to invoke a federal court's jurisdiction to demonstrate that: (1) " 'he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant' "; (2) "the injury 'fairly can be traced to the challenged action' "; and (3) the injury " 'is likely to be redressed by a favorable decision.' " *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (citations omitted). If these constitutional minima are satisfied, a court may nevertheless deny standing for prudential reasons, as for example because the asserted injury constitutes a "generalized grievance" that is more appropriately addressed in the representative branches. *See Allen,* 468 U.S. at 751, 104 S.Ct. at 3324–25 (discussing prudential limits on exercise of federal jurisdiction).

■ The injury asserted by appellees in their second amended complaint is the use of their federal tax dollars for appropriations and expenditures that allegedly violate the Establishment Clause. Accordingly, we must look for guidance to *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), in which the Supreme Court first relaxed its longstanding prohibition on federal taxpayer standing, holding that federal taxpayer status is a sufficient basis for standing if there is (1) "a logical link between that status and the type of legislative enactment attacked"; and (2) "a nexus between that status and the precise nature of the constitutional infringement

alleged." *Id.* at 102, 88 S.Ct. at 1954. In practice, the double nexus test established in *Flast* has been satisfied only in a small class of cases involving exercises of Congress's taxing and spending power, U.S. Const. art. I, § 8, that allegedly violate the specific constitutional limitation upon that power imposed by the Establishment Clause.

Although the Court has repeatedly indicated that taxpayer standing is not a growth industry, *see, e.g., Valley Forge,* 454 U.S. at 481–82, 102 S.Ct. at 763–64; *Schlesinger v. Reservists Comm. to Stop the War,* 418 U.S. 208, 227–28, 94 S.Ct. 2925, 2935–36, 41 L.Ed.2d 706 (1974); *United States v. Richardson,* 418 U.S. 166, 174–80, 94 S.Ct. 2940, 2945–48, 41 L.Ed.2d 678 (1974), it has in one significant respect expanded the narrow rule announced in *Flast.* In *Bowen v. Kendrick,* 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), the Court held that federal taxpayers have standing to raise an Establishment Clause challenge to a congressional spending program—the Adolescent Family Life Act ("AFLA")—*as applied* by the Secretary of Health and Human Services. *See id.* at 618–20, 108 S.Ct. at 2579–80. The Court reasoned:

> [A]ppellees' claim that AFLA funds are being used improperly by individual grantees is [no] less a challenge to congressional taxing and spending power simply because the funding authorized by Congress has flowed through and been administered by the Secretary. Indeed, *Flast* itself was a suit against the Secretary of HEW, who had been given the authority under the challenged statute to administer the spending program that Congress had created. In subsequent cases, most notably *Tilton* [*v.*

*Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971)], we have not questioned the standing of taxpayer plaintiffs to raise Establishment Clause challenges, even when their claims raised questions about the administratively made grants.

*Id.* 487 U.S. at 619, 108 S.Ct. at 2581. The Court concluded that, because appellees' claims "call into question how the funds authorized by Congress are being disbursed pursuant to the AFLA's statutory mandate," there was "a sufficient nexus between the taxpayer's standing as a taxpayer and the congressional exercise of taxing and spending power, notwithstanding the role the Secretary plays in administering the statute." *Id.* at 620, 108 S.Ct. at 2580.

*Flast* and *Kendrick* control the standing analysis in this case. Here as in *Kendrick,* Congress authorized the disbursements that are alleged to violate the Establishment Clause: AID simply carried out Congress's scheme pursuant to its statutory mandate.[2] Therefore, as in *Kendrick,* the first *Flast* nexus requirement has been satisfied. Of course, the second nexus requirement—between "[taxpayer] status and the precise nature of the constitutional infringement alleged," *Flast,* 392 U.S. at 102, 88 S.Ct. at 1954, has also been satisfied here, as this is, as in *Flast* and *Kendrick,* an action arising under the Establishment Clause. Accordingly, appellees' status as federal taxpayers is, as Judge Sand concluded, a sufficient basis for standing in this case.

*In re United States Catholic Conference,* 885 F.2d 1020, 1027–28 (2d Cir.1989), *cert. denied,* — U.S. —, 110 S.Ct. 1946, 109 L.Ed.2d 309 (1990) is not to the con-

---

**2.** Appellants attempt to distinguish *Kendrick* on the ground that Congress *mandated* the expenditures challenged in that case, whereas Congress only *authorized* the expenditures at issue here. However, while it is true that the AFLA, unlike 22 U.S.C. § 2174; explicitly contemplated the involvement of religious organizations, it did not, as appellants claim, *mandate* the provision of aid to religious organizations. *See Kendrick,* 487 U.S. at 604, 108 S.Ct. at 2572 ("There is *no requirement* in the [AFLA] that grantees be affiliated with any religious denomination, although

the Act clearly does not rule out grants to religious organizations.") (emphasis added). In any event, appellants' ground for distinguishing *Kendrick* does not account for *Flast,* which, like the present action, involved a statute that permitted, but did not mandate, the allegedly unconstitutional expenditure of federal funds on religious education. *See Flast,* 392 U.S. at 86–87, 88 S.Ct. at 1945–46 (describing challenged portions of the Elementary and Secondary Education Act of 1965).

trary. There was no claim in *Catholic Conference* that Congress had authorized the challenged agency action. Rather, the taxpayers in that case claimed that the agency was acting *ultra vires* its statutory authority. *See id.* at 1028. Therefore, because plaintiffs did not impugn Congress's exercise of its taxing and spending power, their status as federal taxpayers was insufficiently linked to their claim. The situation would be analogous here if appellees were claiming that appellants' grants to foreign religious schools *contravened* the congressional mandate set forth in 22 U.S.C. § 2174. As Judge Sand recognized, however, appellees in this case do not allege that AID acted *against* the ASHA program's mandate, but rather that AID, in implementing section 2174 *in accordance with* congressional will, acted unconstitutionally. As such, *Kendrick*, not *Catholic Conference*, controls.

Even if appellees satisfy the constitutional requirements for taxpayer standing, appellants argue, prudential considerations dictate that standing should be denied because appellees' claims implicate "the sensitive area of foreign affairs." Brief for Appellants at 19. This argument mistakes the nature of standing doctrine, which "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated." *Flast*, 392 U.S. at 99, 88 S.Ct. at 1952. The fact that the issues in this case touch on foreign policy concerns does not bear on the question whether appellees are the proper parties to request adjudication of those issues. *Id.* at 101, 88 S.Ct. at 1953 ("[I]n deciding the question of standing, it is not relevant that the substantive issues in the litigation might be nonjusticiable"). Rather, that fact raises the separate question whether the issues themselves are justiciable, a question to which we now turn.

## 2. Political Question

 The nonjusticiability of political questions is primarily a function of the constitutional separation of powers among the three branches of the federal government. *See Powell v. McCormack*, 395 U.S. 486, 518, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491 (1969); *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). Accordingly, the dominant consideration in any political question inquiry is "whether there is a 'textually demonstrable constitutional commitment of the issue to a coordinate political department.'" *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2d Cir.1991) (quoting *Baker*, 369 U.S. at 217, 82 S.Ct. at 710); *see also* H. Wechsler, *Principles, Politics and Fundamental Law* 11–14 (1961) ("[T]he only proper judgment that may lead to an abstention from decision is that the Constitution has committed the determination of the issue to another agency of government than the courts.").[3]

 We start our analysis with the truism that purely domestic funding programs are subject to constitutional limitations and to judicial scrutiny. Appellants must therefore demonstrate that the international aspects of the ASHA program compel an opposite result. Because there is no constitutional provision explicitly conferring upon the President or Congress the exclusive power to make foreign aid determinations, appellants rely on more general textual provisions regarding the conduct of foreign relations, and argue that determinations regarding who will receive foreign aid are part of this constitutionally committed power.

 While it is true that the conduct of foreign relations is constitutionally committed to the political branches, *see Oetjen v. Central Leather Co.*, 246 U.S. 297, 302,

---

**3.** Professor Louis Henkin has suggested that cases forswearing judicial review under the political question doctrine are better understood as determinations that the challenged actions were, in fact, constitutional—*i.e.*, that the Constitution imposed no relevant limitations on the powers exercised by the political branches, or that the challenged actions were within the lim-

its prescribed. *See* Henkin, *Is There a "Political Question" Doctrine?*, 85 Yale L.J. 597, 600–01 (1976). By this theory, there is no doctrine requiring extra-ordinary abstention from judicial review of "political questions," there is only ordinary respect by the courts for the constitutional authority of the President and Congress.

38 S.Ct. 309, 310–11, 62 L.Ed. 726 (1918), "it is error to suppose that every case or controversy which touches foreign relations lies beyond judicial cognizance." *Baker*, 369 U.S. at 211, 82 S.Ct. at 707; *see also Japan Whaling Ass'n v. American Cetacean Soc'y*, 478 U.S. 221, 229–30, 106 S.Ct. 2860, 2865–66, 92 L.Ed.2d 166 (1986). The power of the President and Congress to conduct foreign relations does not give them *carte blanche* to transgress well-established constitutional boundaries, *see Reid v. Covert*, 354 U.S. 1, 16, 77 S.Ct. 1222, 1230, 1 L.Ed.2d 1148 (1957) (plurality); and the Judiciary "cannot shirk [its constitutional] responsibilit[ies] merely because [a] decision may have significant political overtones." *Japan Whaling*, 478 U.S. at 230, 106 S.Ct. at 2866. Whether a case or controversy that touches foreign relations lies beyond judicial cognizance can only be determined by "a discriminating analysis of the particular question posed," *Baker*, 369 U.S. at 211, 82 S.Ct. at 707, including consideration of "the history of its management by the political branches, of its susceptibility to judicial handling in light of its nature and posture in the specific case, and of the possible consequences of judicial action." *Id.* at 211–12, 82 S.Ct. at 707.

Here, in light of the absence of any significant history of the political branches managing foreign aid to religious institutions, *see infra*, we find that adjudication of appellees' claim will not involve judicial usurpation of the political branches' constitutional powers to formulate foreign policy. Rather, we find that this case is on all fours with *Planned Parenthood Fed'n, Inc. v. AID*, 838 F.2d 649 (2d Cir.1988), in which we allowed a challenge to AID's implementation of a formal Policy Statement that committed the United States to withholding federal assistance from foreign nongovernmental organizations that performed or actively promoted abortions. We noted in *Planned Parenthood* that:

> [w]hile courts are not competent to formulate national policy or to review controversies which "revolve around policy choices and value determinations constitutionally committed" to Congress or the executive branch, it is a court's duty to determine whether the political branches, in exercising their powers, have "chosen a constitutionally permissible means of implementing that power."

*Id.* at 655–56 (citations omitted). Because AID's method of implementing the Policy Statement was not itself an expression of foreign policy, *see id.* at 656, we concluded that plaintiffs' challenge to the legality of that method did not present a nonjusticiable political question. *Id.; accord DKT Mem. Fund, Ltd. v. AID*, 810 F.2d 1236, 1238 (D.C.Cir.1987).[4] Here as in *Planned Parenthood*, appellees do not seek to adjudicate the lawfulness or political wisdom of the government's policy, which is to promote foreign schools that serve as "study and demonstration centers for ideas and practices of the United States." 22 U.S.C. § 2174(a) (1988). Rather, appellees take issue only with appellants' method of administering that policy. For this reason, the instant case, like *Planned Parenthood*, is justiciable.[5]

**4.** Also analogous is *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1511–15 (D.C.Cir. 1984) (en banc), in which the court held that the government's construction and operation of a military training camp on plaintiff's private property in Honduras did not present a political question. The court reasoned that Ramirez did not seek to adjudicate the lawfulness of the United States military presence in Honduras, or of the government's sponsorship of the military training center for which his land was seized. *Id.* at 1512. Rather, Ramirez sought adjudication of "the narrow issue" whether the government could run military exercises on his private land when that land had not been lawfully expropriated. *Id.* This challenge to the implementation of the government's military policy was, the court held, "a paradigmatic issue for resolution by the Judiciary." *Id.*

Ramirez was vacated, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985), and ultimately dismissed, 788 F.2d 762 (D.C.Cir.1986) (en banc) (per curiam), on other grounds.

**5.** The district court's determination that this case did not present a political question turned on the involvement of private domestic organizations in the ASHA program. *See* 748 F.Supp. at 1048–49. Specifically, the court noted that the ASHA program, as implemented by AID, channels all grants through domestic nonprofits, which also provide their foreign affiliates with continuing administrative and finan-

The critical distinction between policy and implementation also provides a solid basis for distinguishing this case from *Dickson v. Ford*, 521 F.2d 234 (5th Cir. 1975) (per curiam), *cert. denied*, 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 360 (1976), on which appellants place principal reliance. In *Dickson*, the Fifth Circuit dismissed as nonjusticiable an Establishment Clause challenge to a statute authorizing $2.2 billion of emergency military assistance to the State of Israel. *See id.* at 235–36. Had the challenge been successful, Congress's foreign policy goal—to maintain the balance of power in the Middle East and to preserve Israel's capacity to defend herself, *see id.* at 236—could not have been achieved. Effectively, then, the challenge in *Dickson* was to the foreign policy itself, *see id.* ("Appellant's challenge ... is ... to the power of the President and Congress to conduct the foreign affairs of the United States"), not, as here and in *Planned Parenthood*, a challenge to one possible method of policy implementation.[6]

Appellants' next argument for dismissing this case as nonjusticiable is that the question whether foreign aid grants to schools abroad violate the Establishment Clause is not "susceptibl[e] to judicial handling." *Baker*, 369 U.S. at 211, 82 S.Ct. at 706–07; *see also id.* at 217, 82 S.Ct. at 710 (listing "lack of judicially discoverable and manageable standards" as factor in political question analysis). We believe, however, that the instant challenge simply requires the court to apply well-established Establishment Clause standards, a task traditionally vested in the federal courts.

Granted, appellees' contention that these standards are largely unmanageable even in the domestic context is not entirely without merit. However, we do not believe that the foreign situs of the schools in this case will insuperably complicate what would, in any event, be a rather difficult adjudicatory task.

Finally, appellants argue that judicial action in this area would have harmful consequences because it would force the United States to show disrespect for the traditions and religions of foreign nations and would embarrass those nations by allowing United States courts to scrutinize their educational policies. They also claim that the courts' application of the Establishment Clause would prevent the grant of any aid whatsoever in some countries. This last criticism is addressed later in this opinion, and is an overstatement of how rigidly the Establishment Clause might constrict the aid grants. *See infra.* As to the possible embarrassment of foreign nations, we note that ASHA grants go to private organizations based in the United States, for use by non-governmental institutions abroad. The likelihood that foreign governments, which might neither know nor care about these grants, will be outraged by the inability of certain American-based organizations to obtain funds from the United States Congress seems slim. As for showing disrespect for foreign cultures and traditions, we note that the very goal of the ASHA program is to spread *American* ideas—potentially a far greater challenge to traditional cultures than the effect of imple-

cial support. We fail to see how this distinction has relevance for justiciability purposes. In our opinion, the fact that the Government chose to use private domestic organizations as conduits for the ASHA grants in no way diminishes the foreign policy concerns that tripped the political question alarm in the first place.

6. *Dickson* may be distinguishable on other grounds as well. For example, because the issue in *Dickson* involved a diplomatic and military policy decision founded on national security concerns, it arguably was textually committed to the political branches by the Commander-in-Chief and War Powers provisions. *Cf. Johnson v. Eisentrager*, 339 U.S. 763, 789, 70 S.Ct. 936, 949, 94 L.Ed. 1255 (1950) (dismissing

claims by enemy aliens that effectively challenged the propriety of U.S. military presence in China); *Greenham Women Against Cruise Missiles v. Reagan*, 755 F.2d 34, 37 (2d Cir.1985) (per curiam) (dismissing challenge to executive decisions regarding deployment of cruise missiles); *Crockett v. Reagan*, 720 F.2d 1355, 1356–57 (D.C.Cir.1983) (per curiam) (dismissing challenge to legality of U.S. military aid to El Salvador), *cert. denied*, 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984). *Dickson* may also have turned in part on prudential considerations not present in this case. *See Baker*, 369 U.S. at 217, 82 S.Ct. at 710 (listing four prudential considerations incorporated in the political question doctrine).

menting the constitutional mandate that Congress may not, as a general rule, fund pervasively sectarian institutions. Moreover, ASHA grants often go to schools that are themselves not part of the traditional culture of the country in which they operate—we doubt the Catholic girls' school in Korea can be said to reflect any particularly Korean ideas regarding the propriety of mixing education and religion. In sum, we believe any harm to American foreign policy resulting from judicial review of this question would be *de minimis.*

Thus, we conclude that this case does not present a nonjusticiable political question.

### 3. *Applicability of the Establishment Clause to ASHA Grants*

■ The final question before us is whether the Establishment Clause applies to government grants to foreign religious institutions located outside the United States. To our knowledge, this question has never before been adjudicated.

■ At the outset, we note that AID's grants to the domestic sponsors must be subject to ordinary Establishment Clause scrutiny. The fact that these domestic organizations arguably serve only as conduits for foreign aid should not exempt them from the First Amendment restrictions to which they would normally be subject. The question that remains, of course, is to what extent, if any, the Establishment Clause applies to the international aspects of the ASHA program.

The Supreme Court's most thorough exegesis on the extraterritorial application of constitutional provisions was delivered just last Term in *United States v. Verdugo–Urquidez,* 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990), where the Court held that the Fourth Amendment does not apply to a search and seizure by United States officials of property that is owned by a nonresident alien and located in a foreign country. *See id.* 110 S.Ct. at 1059. Although *Verdugo* is a Fourth Amendment case, it nonetheless provides a helpful analytical framework for determining whether other constitutional provisions apply to governmental activities having extraterrito-

rial dimensions. Specifically, the *Verdugo* Court identified three factors as significant to such a determination: (1) the operation and text of the constitutional provision; (2) history; and (3) the likely consequences if the provision is construed to restrict the government's extraterritorial activities. *Id.* 110 S.Ct. at 1066.

#### a. Operation and Text.

Before analyzing the scope of the Fourth Amendment, the *Verdugo* Court "[thought] it significant to note" that Fourth Amendment violations are fully accomplished at the time of the unreasonable governmental intrusion. *Id.* at 1060. Therefore, the Court concluded, "[f]or the purposes of this case ... if there were a constitutional violation, it occurred solely in Mexico." *Id.* The Court suggested that had U.S. officials in Mexico impaired Verdugo–Urquidez's Fifth Amendment privilege against self-incrimination, the situation would be different, as that privilege can only be violated at trial, and Verdugo–Urquidez was tried in the United States. *See id.; see also id.* at 1068 (Kennedy, *J.,* concurring) ("All would agree ... that the dictates of the Due Process Clause of the Fifth Amendment protect the defendant."). In his concurrence, Justice Kennedy suggested that the situation would also be different if "[t]he rights of a citizen, as to whom the United States has continuing obligations," were presented. *Id.*

■ Unlike the Fourth Amendment violation in *Verdugo,* we hold that any alleged Establishment Clause violations in this case, if established, would have occurred in the United States—*i.e.,* at the time that appellants granted money to United States entities for the benefit of foreign sectarian institutions—and not abroad—*i.e.,* at the time the money was received or expended. In other ways, too, the domestic interests in this case are far greater than those in *Verdugo.* For example, because religion transcends national boundaries, ASHA aid to a Catholic school in the Philippines may strengthen not only that school, but also the Catholic Church worldwide, and, in particular, the Catholic

sponsor in the United States and its domestic constituency. Moreover, while an unreasonable search and seizure of an alien abroad causes no cognizable injury to any United States citizen, the grants challenged in this case, if violative of the Establishment Clause, impose a cognizable injury on every citizen who files a federal tax return. For all these reasons, we believe that the operation of the Establishment Clause strongly indicates that its restrictions should apply extraterritorially.

Having considered the operation of the Fourth Amendment, the *Verdugo* Court shifted its focus to the constitutional text. The Fourth Amendment guarantees "[t]he right of *the people* to be secure ... against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). To a plurality of the Court, the use of the phrase "the people" suggested that the Framers of the Constitution intended the amendment to apply only to those persons who were part of or substantially connected to the national community.[7] 110 S.Ct. at 1061. By this reasoning, a citizen and resident of Mexico with no voluntary connection to the United States is not among "the people" entitled to Fourth Amendment protection. *See id.* at 1064.

The Establishment Clause, unlike the Fourth Amendment, contains no limiting language. Indeed, the basic structure of the Establishment Clause, which imposes a restriction on Congress, differs markedly from that of the Fourth Amendment, which confers a right on the people. The importance of this distinction was highlighted in *Downes v. Bidwell,* 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901), where the Court held that Puerto Rico was not a part of the United States within the meaning of the Uniform Duties Clause, U.S. Const. art. I, § 8, cl. 1 (declaring that "all Duties, Imposts and Excises shall be uniform throughout the United States"). In determining that the Uniform Duties Clause did

not have application beyond the states, the *Downes* Court noted the "clear distinction between such prohibitions as go to the very root of the power of Congress to act at all, irrespective of time or place, and such as are operative only 'throughout the United States' or among the several States." *Id.* at 277, 21 S.Ct. at 783. The Court then observed:

> [W]hen the Constitution declares that "no bill of attainder or *ex post facto* law shall be passed," and that "no title of nobility shall be granted by the United States," it goes to the competency of Congress to pass a bill of that description. *Perhaps, the same remark may apply to the First Amendment, that "Congress shall make no law respecting an establishment of religion...."* We do not wish, however, to be understood as expressing an opinion how far the bill of rights contained in the first eight amendments is of general and how far of local application.

*Id.* (emphases altered). Thus, the Court itself has suggested that the constitutional prohibition against establishments of religion targets the competency of Congress to enact legislation of that description—irrespective of time or place.

b. History

In its search for the meaning of the Fourth Amendment, the *Verdugo* Court sought advice from the Founding Fathers, as revealed in the drafting history of the Fourth Amendment and in legislative acts passed by the early Congresses. Our own quest for the original understanding of the Framers has been informative but, ultimately, inconclusive. Understandably, there was no discussion of the extraterritorial application of the Establishment Clause when the First Amendment was adopted. The First Congress had far more immediate concerns about religion and the state to devote time to an issue that is arising only now, two centuries after the ratification of

---

7. Justice Kennedy, who joined the majority opinion, wrote in a separate concurrence that he "place[d] [no] weight on the reference to 'the people' in the Fourth Amendment as a source of restricting its protections." 110 S.Ct. at 1067 (Kennedy, *J.,* concurring). The four justices

who did not join the majority opinion agreed that "the people" encompasses aliens brought to trial in the United States for violations of United States criminal laws. *See id.* at 1068 (Stevens, *J.,* concurring); *id.* at 1070–71 (Brennan, *J.,* dissenting); *id.* at 1078 (Blackmun, *J.,* dissenting).

the Bill of Rights. *See* Ragosta, *Aliens Abroad: Principles for the Application of Constitutional Limitations to Federal Action,* 17 N.Y.U.J. Int'l L. & Pol. 287, 288 (1985); Note, *The Extraterritorial Application of the Constitution—Unalienable Rights?,* 72 Va.L.Rev. 649, 649 (1986); *cf. Thomas v. Review Bd.,* 450 U.S. 707, 722, 101 S.Ct. 1425, 1434, 67 L.Ed.2d 624 (1981) (Rehnquist, *J.,* dissenting) (arguing that because the Framers could not anticipate future developments, "we simply do not know how they would view the scope of the two [religion] Clauses"). Still, history does provide us with some clues as to the intended scope of the Establishment Clause.

According to appellants, the Establishment Clause had one overriding historical purpose: to forbid the federal government from establishing a "national religion"— *i.e.,* an officially favored status for one or more religious sects within the United States.[8] To support this theory, appellants cite James Madison's first proposed draft of the Establishment Clause,[9] introduced to the First Congress on June 8, 1789, which

prohibited the establishment of "any *national* religion." *See* 1 *Annals of Cong.* 434 (J. Gales ed. 1789) (emphasis added).[10] Appellants also rely on Madison's statement during the August 15, 1789 House debate that the religion clauses were intended to allay the concerns of many state conventions that the Necessary and Proper Clause, U.S. Const. art. I, § 8, cl. 18, would permit Congress to establish a national religion. *See* 1 *Annals of Cong.* 729–31.

As one might expect of scholarship born of advocacy, appellants' treatment of history is selective and one-sided. To be sure, Madison's use of the phrase "any national religion" is strong evidence of his personal conception of the purpose of the religion clauses. However, more interesting in our view is the fact that, for unknown reasons, the committee responsible for reviewing Madison's proposed amendments chose to delete the word "national" from the clause on establishments before sending the draft to the House floor;[11] that the House of Representatives rejected Madison's motion to restore that word to the text;[12] and that

---

**8.** Appellants recognize that a corollary purpose of the Establishment Clause was to forbid the federal government from interfering with the religious establishments maintained by the States of the Union. *See* Conkle, *Toward a General Theory of the Establishment Clause,* 82 Nw.U.L.Rev. 1113, 1133–35 (1988); Van Alstyne, *What is "An Establishment of Religion"?,* 65 N.C.L.Rev. 909, 910–11 (1987). However, this purpose became irrelevant in 1947, when the Supreme Court applied the Establishment Clause to the states through the Fourteenth Amendment. *See Everson v. Board of Educ.,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511–12, 91 L.Ed. 711 (1947).

**9.** While Madison's proposal constituted the "original" draft of the Establishment Clause in that it set the agenda for the House debates, it was hardly the first proposal for an amendment relating to religious liberties. Three of the eleven colonies that ratified the Constitution by early 1789 proposed amendments pertaining to religious establishments. New Hampshire's proposal read: "Congress shall make no laws touching religion or [infringing] the rights of conscience." 1 *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 326 (J. Elliot 2d ed. 1836). New York's amendment provided "that no religious sect or society ought to be favored or established by law in preference to others." *Id.* at 328. Finally, Virginia's amendment stated that "no particular religious sect or society ought to be favored

or established, by law, in preference to others." 3 *id.* at 659. Neither these nor similar amendments later proposed by Rhode Island and North Carolina, *see* 1 *id.* at 334–35; 4 *id.* at 244, confined its prohibitions to "national" establishments. *See generally* L. Levy, *The Establishment Clause: Religion and the First Amendment* 67–74 (1986) (discussing state ratification debates).

**10.** The provision read:

The civil rights of none shall be abridged on account of religious belief or worship, *nor shall any national religion be established,* nor shall the full and equal rights of conscience be in any manner, or on any pretext, infringed. 1 Annals of Cong. 434 (emphasis added).

**11.** The committee's draft provided that "no religion shall be established by law, nor shall the equal rights of conscience be infringed." 1 *Annals of Cong.* 729.

**12.** Madison withdrew his motion after Elbridge Gerry argued that use of the word "national" would imply that the government created by the Constitution was a national government rather than a union of states. 1 *Annals of Cong.* 731; Smith, *Getting Off on the Wrong Foot and Back on Again: A Reexamination of the History of the Framing of the Religion Clauses of the First Amendment and a Critique of the* Reynolds *and*

the First Congress ultimately adopted an unqualified prohibition on "law[s] respecting an establishment of religion." More important, appellants' focus on one isolated document eclipses the true historical origins of the Establishment Clause.

Properly viewed—and as recounted in considerable detail in *Everson v. Board of Educ.*, 330 U.S. 1, 11–16, 67 S.Ct. 504, 509–12, 91 L.Ed. 711 (1947)—the history of the drafting of the Establishment Clause begins no later than 1785. In that year, Madison penned his eloquent "Memorial and Remonstrance against Religious Assessments" opposing a bill before the Virginia General Assembly that would have established a funding provision for teachers of the Christian religion.[13] Drawn in the form of a petition and signed by several thousand Virginians, the Remonstrance was not only instrumental in defeating the proposed tax measure, but also revived interest in Thomas Jefferson's "Bill for Establishing Religious Freedom," which, having languished in the legislature since 1779, was enacted by the Virginia General Assembly in January 1786. *See* Dreisbach, *Thomas Jefferson and Bills Number 82–86 of the Revision of the Laws of Virginia, 1776–1786: New Light on the Jeffersonian Model of Church–State Relations*, 69 N.C.L.Rev. 159, 169–70 (1990). The Preamble to the Virginia Statute of Religious Freedom declared " 'that to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical,' " and the statute itself provided " '[t]hat no man shall be compelled to ... support any religious worship, place, or ministry whatsoever.' " *Everson*, 330 U.S. at 13, 67 S.Ct. at 510.

The drafting and adoption of the First Amendment, in which Madison and Jefferson played leading roles, can only be understood in light of the Virginia experience. *See id.* at 11–15, 67 S.Ct. at 509–11. In

that light, the tax factor clearly emerges as one of the principal historical underpinnings of the Establishment Clause. As the Supreme Court stated in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968):

> Our history vividly illustrates that one of the specific evils feared by those who drafted the Establishment Clause and fought for its adoption was that the taxing and spending power would be used to favor one religion over another or to support religion in general.... The concern of Madison and his supporters was quite clearly that religious liberty ultimately would be the victim if government could employ its taxing and spending powers [in this manner].

*Id.* at 103–04, 88 S.Ct. at 1954; *see also* Choper, *The Religion Clauses of the First Amendment: Reconciling the Conflict*, 41 U.Pitt.L.Rev. 673, 677 (1980) ("The practice perceived by the Framers as perhaps the most serious infringement of religious liberty sought to be corrected by the Establishment Clause was forcing the people to support religion by the use of compulsory taxes for purely sectarian purposes.").

▮ Where the expenditure of federal tax money is concerned, there can be no distinction between foreign religious institutions and domestic religious institutions—particularly when the former are sponsored and supported by the latter. As noted above, religions such as Catholicism and Judaism know no national boundaries, and are strengthened domestically when promoted abroad. Given the primacy of the tax factor in the minds of the Framers, we cannot but conclude that the Madison, Jefferson, or any of the supporters of the Establishment Clause would have abhorred—as much as a tax for the support of Christian teachers—the use of federal tax money for the support of foreign sectarian schools.[14]

Everson *Decisions,* 20 Wake Forest L.Rev. 569, 612 (1984).

**13.** The Remonstrance is reprinted in full as an appendix to Justice Rutledge's dissent in *Everson*, 330 U.S. at 63–72, 67 S.Ct. at 534–39.

**14.** Nor would they have been alone in their opposition. Many of the colonists had fled Europe precisely because of religious oppression. Would Pennsylvania Quakers, Massachusetts Puritans, Maryland Catholics, or Southern Baptists willingly have paid taxes to support the

To be sure, the Founding Fathers—as women and slaves would no doubt have agreed—were not perfect. The early Congresses did give money to the Northwest Territory[15] and to the Kaskaskia Indians[16] for religious purposes. While these expenditures may suggest that some of the Framers and their contemporaries did not believe the religion clauses applied outside the States of the Union, they are not dispositive of the issue. "[P]ost-adoption history must be used cautiously as a guide to Framers' intent, particularly where ... the issues are far from identical." L.Tribe, *American Constitutional Law* § 14-3, at 1163 (2d ed. 1988).[17] Besides, more recent history supports the view that the religion clauses do have extraterritorial application. In 1878, the Supreme Court held that "Congress cannot pass a law for the government of the Territories which shall prohibit the free exercise of religion," *Reynolds v. United States*, 98 U.S. 145, 162, 25 L.Ed. 244 (1878) (upholding law criminalizing polygamy in the Territory of Utah), and six years later, the Court opined that the prohibition on religious establishments also applied to territories governed by the United States. *See Chicago, Rock Island & Pac. Ry. v. McGlinn*, 114 U.S. 542, 546, 5 S.Ct. 1005, 1006, 29 L.Ed. 270 (1885) (dicta); *see also Quick Bear v. Leupp*, 210 U.S. 50, 81–82, 28 S.Ct. 690, 699–700, 52 L.Ed. 954

(1908) (assuming that both religion clauses affect United States relations with the Indian tribes). Congress terminated subsidies to religious Indian schools in the late 1890s, after the practice became a source of sectarian conflict between Protestants and Catholics. *See* J. Nichols, *The Uneasy Alliance: Religion, Refugee Work, and U.S. Foreign Policy*, 215–16 (1988). In the 1960s, Congress dropped its plan to use church agencies in the Peace Corps after Protestant groups protested. *See id.* at 96–97, 194. Today, to achieve eligibility for government funding, religiously-based refugee, relief and development agencies must form separately incorporated secular branches. *See id.* at 218–19, 225. Finally, and of particular note, is AID's own incorporation of Establishment Clause factors into its guidelines for evaluating grant applicants. *See* 44 Fed.Reg. 67,544 (criterion 8) (foreign schools "must be open to all persons regardless of ... religion," and grants "may not be used to train persons for religious pursuits or to construct ... facilities intended for worship or religious instruction").

As we stated at the outset, history offers only limited guidance in this case. At the very least, however, it reveals that the Establishment Clause was intended to pro-

---

Church of England, by which they felt oppressed? Would Virginia Anglicans or Sephardic Jews willingly have supported Catholic churches in France or Spain?

**15.** The Northwest Ordinance, which was passed by the Confederate Congress in July 1787 and reenacted by the First Congress in 1789, declared that *"[r]eligion,* morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." Ordinance of 1787: The Northwest Territorial Government, art. III (emphasis added), *reprinted in* U.S.C.A. Const. Art. I, at 17, 21 (1987).

Interestingly, Congress in 1789 did not reenact the provision whereby one lot in each township in the western territories would be set aside in perpetuity for the support of religion. *See* L. Levy, *supra,* at 173.

**16.** In 1803, President Jefferson concluded and the Senate ratified a treaty providing for the erection of a church for the Kaskaskia Indians and the payment of a priest to conduct religious

services for them. *See* Treaty with Kaskaskias, Act of Aug. 13, 1803, 7 Stat. 79; Smith, *supra,* at 598, 628.

**17.** The dangers attendant on undue reliance on post-adoption history are legion. Indeed, one need look no further than the Alien and Sedition Acts of 1789—which proscribed core First Amendment speech—to recognize the Founding Fathers' fallibility. In any event, why should posterity attach greater weight to early legislation than the Framers did themselves? It seems curious, for example, to uphold the constitutionality of legislative prayer because that practice was instituted by the men who wrote the religion clauses, *see Marsh v. Chambers*, 463 U.S. 783, 786–88, 103 S.Ct. 3330, 3333–34, 77 L.Ed.2d 1019 (1983), without regard to the fact that at least one of those men, who had served on the committee that created the first congressional chaplaincies, later acknowledged that the practice was patently unconstitutional. *See id.* at 807–08, 103 S.Ct. at 3344–45 (Brennan, *J.,* dissenting) (discussing Madison's "detached memoranda").

tect both against the kind of governmental encroachment that might lead to the establishment of a national religion, and against the taxation of citizens in order to support religion. Still, we are reluctant to base our constitutional decisionmaking on this finding. In our view, it is perilous to speak of an overall "intent" of the Framers as if they were a cohesive group. One historical fact is clear: the Bill of Rights was demanded by the party that opposed the document as a whole. The Antifederalists strove to weaken the national government and to maintain populist control through the states. Their espousal of Bills of Rights—and in particular, amendments concerning religion—was arguably a tactic to reduce the overall power of the central government more than a reflection of concern for the rights of religious minorities. *See* L. Levy, *The Establishment Clause: Religion and the First Amendment* 66–67, 85–89 (1986); H. Storing, *What the Anti–Federalists Were For* 67 (1981); *cf.* J.T. Main, *The Antifederalists: Critics of the Constitution 1781–1788* at 159 (1961) ("Antifederalists were not greatly concerned about religious freedom under the Constitution."). Meantime, the Federalists only grudgingly endorsed the amendments to win over swing votes. *See The Federalist* No. 84, at 513–15 (A. Hamilton) (C. Rossiter ed. 1961); 1 *Annals of Cong.* 432–33 (speech of J. Madison introducing proposed amendments). To whose "intent," then, do we ascribe the result? Can even the immediately subsequent actions of either group be regarded as a depository regarding the amendments' meaning?

Equally important, in the few instances where the intent of the Framers has been evident, it has quite often been ignored. For example, it would be difficult for any serious student of history to argue that the Congresses that passed the Bill of Rights or the Reconstruction amendments intended them to be used to outlaw racial segregation in public schools; yet today, virtually nobody would argue that *Brown v. Board of Educ.*, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) should be overturned. Thus, originalists must confront "a fundamental difficulty," namely: "[c]an original-

ism make sense out of a constitutional order that varies significantly from [originalism's] core legitimating principle?" Monaghan, *Stare Decisis and Constitutional Adjudication*, 88 Colum.L.Rev. 723, 723–24 (1988). Manifestly, it cannot. In our view, slavish quests for the original intent of the Framers inevitably make for bad history, bad social policy, and bad law.

"Attention to the details of history should not blind us to the cardinal purposes of the Establishment Clause." *Lynch v. Donnelly*, 465 U.S. 668, 719, 104 S.Ct. 1355, 1383, 79 L.Ed.2d 604 (1984) (Brennan, J., dissenting); *see also* Monaghan, *supra*, at 724 (concluding that "original understanding must give way in the face of transformative or longstanding precedent"). Whether or not the Establishment Clause was originally intended to prohibit taxation for religious purposes, that prohibition has been regarded as fundamental at least since 1947, when the Supreme Court announced that "[n]o tax in any amount, large or small, can be levied to support any religious activities or institutions, whatever they may be called, or whatever form they may adopt to teach or practice religion." *Everson*, 330 U.S. at 16, 67 S.Ct. at 511–12; *see also Lemon v. Kurtzman*, 403 U.S. 602, 612, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745 (1971); *Walz v. Tax Comm'n*, 397 U.S. 664, 668, 90 S.Ct. 1409, 1411, 25 L.Ed.2d 697 (1970); Sunstein, *Why the Unconstitutional Conditions Doctrine is an Anachronism (with Particular Reference to Religion, Speech and Abortion)*, 70 B.U.L.Rev. 593, 609 (1990) ("Taxpayers' ... objections to the public funding of religious schools ... are an inextricable part of the rationale behind the establishment clause."). As previously discussed, the expenditure of tax dollars for the support of religious institutions or activities offends the "no taxation" principle regardless of the physical situs of those institutions or activities. Likewise, the message communicated by direct government funding of religious institutions remains the same whether those institutions are located in the United States or abroad. Thus, ASHA grants to foreign sectarian schools may

offend what has in modern times been recognized as another fundamental Establishment Clause value: non-endorsement. *See County of Allegheny v. ACLU,* 492 U.S. 573, 593–94, 109 S.Ct. 3086, 3100–01, 106 L.Ed.2d 472 (1989) (plurality) ("The Establishment Clause, at the very least, prohibits government from appearing to take a position on questions of religious belief."); *Lynch,* 465 U.S. at 692, 104 S.Ct. at 1369 (O'Connor, *J.,* concurring) ("What is crucial is that a government practice not have the effect of communicating a message of government endorsement or disapproval of religion."). In short, whatever the Founding Fathers may have believed, general principles of Establishment Clause jurisprudence provide no basis for distinguishing between foreign and domestic establishments of religion.

c. Policy Considerations.

Having reviewed the operation, text, and history of the Fourth Amendment, the Court in *Verdugo* considered the "significant and deleterious consequences for the United States" were the respondent to prevail. 110 S.Ct. at 1065. The Court specified three particularly unwelcome consequences. First, aliens with no attachment to the U.S. might be able to bring actions under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), to remedy Fourth Amendment violations in foreign countries. 110 S.Ct. at 1065. Second, the courts would have to invent a whole new body of jurisprudence to establish what was "reasonable" in the way of searches and seizures conducted abroad. *Id.* at 1065. Third and most important, the Government's ability to employ the armed forces abroad might be affected, "significantly disrupt[ing] the ability of the political branches to respond to foreign situations involving our national interest." *Id.*

Application of the Establishment Clause to the ASHA program would have none of the deleterious consequences envisioned in *Verdugo.* First, we can think of no theory under which aliens would have standing to challenge either a grant by AID or a denial of aid. Second, domestic Establishment Clause jurisprudence is flexible enough to accommodate any special circumstances created by the foreign situs of the expenditures. *See infra.* Third, like Judge Sand, we can identify "no direct relationship between educational programs and national security interests." [18] 748 F.Supp. at 1051.

 Appellants, of course, take a gloomier view of the consequences of requiring grants under the ASHA program to comport with the strictures of the Establishment Clause. In particular, appellants fear a reduction in the efficacy of the ASHA program as a foreign policy initiative. However, while we recognize the importance of foreign aid programs in promoting United States foreign policy, we do not believe that this warrants freeing all foreign aid programs from all constitutional constraint. Just as it is error to suppose that every question touching on foreign policy is nonjusticiable, it would be error to suppose that every such question lies beyond the Constitution's limitations on governmental conduct. *Cf. Verdugo,* 110 S.Ct. at 1067 (Kennedy, *J.,* concurring) ("[T]he Government may act only as the Constitution authorizes, whether the actions in question are foreign or domestic"); *Reid v. Covert,* 354 U.S. 1, 5–6, 77 S.Ct. 1222, 1224–25, 1 L.Ed.2d 1148 (1957) (plurality) (same) *Verdugo* suggests that it is the *magnitude* of the impact on foreign policy—not simply the presence of foreign policy concerns—that matters. *See* 110 S.Ct. at 1065 (noting that application of the Fourth Amendment abroad "would have *significant and deleterious consequences* for the United States in conducting activities beyond its boundaries ... [and] could *significantly disrupt* the ability of the po-

---

**18.** To be sure, other foreign aid programs—*e.g.,* military aid programs—may well implicate national security interests. We need not consider such programs to decide this case, however. *Cf. Dickson v. Ford,* 521 F.2d 234, 236 (5th Cir.1975)

(per curiam) (dismissing challenge to grants of military assistance to Israel as non-justiciable political question), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 360 (1976).

litical branches to respond to foreign situations involving our national interest") (emphasis added). Here, we believe that the foreign policy ramifications of applying the Establishment Clause to ASHA grants will be minimal. For one thing, appellants are already guided by Establishment Clause principles in determining eligibility for ASHA grants. *See* 44 Fed.Reg. 67,544 (criterion 8). Appellants are also under a specific statutory mandate to promote "ideas and practices of the United States." 22 U.S.C. § 2174(a) (1988). Because the principle of separation of church and state reflected in the Establishment Clause is among our most fundamental "ideas and practices," it would be rather incongruous for appellants to ignore Establishment Clause values when selecting grantees. In addition, as we explain below, traditional Establishment Clause standards are flexible enough to accommodate any urgent dictates of United States foreign policy.

### 4. Application of Establishment Clause Standards to ASHA Grants.

█ Our holding today that the Establishment Clause places some limitations on governmental activity abroad does not mean that all ASHA grants to sectarian schools are unconstitutional. Recognizing that "[s]ome relationship between government and religious organizations is inevitable," *Lemon v. Kurtzman*, 403 U.S. 602, 614, 91 S.Ct. 2105, 2112, 29 L.Ed.2d 745 (1971), the Supreme Court has repeatedly allowed domestic religious institutions to participate in governmental grant programs, so long as they use taxpayer money for secular purposes only. *See, e.g., Wolman v. Walter*, 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977) (upholding provision of standardized testing and other services to parochial schools); *Roemer v. Board of Pub. Works*, 426 U.S. 736, 96 S.Ct. 2337, 49 L.Ed.2d 179 (1976) (upholding subsidies to religious colleges with broad liberal arts curriculums); *Tilton v. Richardson*, 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (upholding aid to church-affiliated colleges for construction of buildings to be used for secular purposes); *Board of Educ. v. Allen*, 392 U.S. 236, 88 S.Ct. 1923,

20 L.Ed.2d 1060 (1968) (upholding loans of secular textbooks to parochial school students); *Everson v. Board of Educ.*, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947) (upholding reimbursements to parents of parochial school students for bus transportation expenses); *Bradfield v. Roberts*, 175 U.S. 291, 20 S.Ct. 121, 44 L.Ed. 168 (1899) (upholding payments to church-affiliated hospital for construction and support of an isolating building). Surely, the constitutional limitations are no stricter when the benefitted religious institutions lie outside the United States. By the same token, however, we find no merit in appellants' contention that those limitations should be more relaxed in that situation. In our view, domestic Establishment Clause jurisprudence has more than enough flexibility to accommodate any special circumstances created by the foreign situs of the expenditures, although the international dimension does, we believe, enter into the analysis.

█ Whether governmental action violates the Establishment Clause depends on whether it has a secular purpose, whether its principal or primary effect is to advance or inhibit religion, and whether it creates an excessive government entanglement with religion. *See Lynch*, 465 U.S. at 679, 104 S.Ct. at 1362; *Lemon*, 403 U.S. at 612–13, 91 S.Ct. at 2111. As Judge Sand observed, the ASHA program has the legitimate secular purpose of assisting foreign schools that teach American ideas and practices. *See* 748 F.Supp. at 1054. The focus of the debate in this case is therefore on the primary-effect and excessive-entanglement questions. Because the former question will likely be critical on remand, we offer the following guidance for the district court.

█ In the usual Establishment Clause case, direct aid is considered to have a principal or primary effect of advancing religion whenever it flows to a "pervasively sectarian" institution. *See Bowen v. Kendrick*, 487 U.S. 589, 610, 108 S.Ct. 2562, 2574–75, 101 L.Ed.2d 520 (1988); *Hunt v. McNair*, 413 U.S. 734, 743, 93 S.Ct. 2868, 2874, 37 L.Ed.2d 923 (1973). "Pervasively sectarian" is an ill-defined term of art

roughly describing " 'institution[s] in which religion is so pervasive that a substantial portion of [their] functions are subsumed in the religious mission.' " *Kendrick*, 487 U.S. at 610, 108 S.Ct. at 2574 (quoting *Hunt*, 413 U.S. at 743, 93 S.Ct. at 2874). The general prohibition on funding pervasively sectarian institutions is essentially a prophylactic rule, designed to prevent the "risk" that the government's money, though designated for a specific secular purpose, "may nonetheless advance the pervasively sectarian institution's 'religious mission.' " *Kendrick*, 487 U.S. at 610, 108 S.Ct. at 2574. The rule thus reflects a determination that such risk, as a general matter, is unacceptable. In practice, because characterization of an institution as pervasively sectarian ends the constitutional inquiry, the pervasively sectarian test may result in the summary invalidation of expenditures that do not have the primary effect of advancing religion, and so do not, in fact, offend the Establishment Clause. *Cf. id.* at 633, 108 S.Ct. at 2587 (Blackmun, *J.*, dissenting) ("The [pervasively sectarian] label ... serves in some cases as a proxy for a more detailed analysis of the institution, the nature of the aid, and the manner in which the aid may be used.").

While the analytical shortcut provided by the pervasively sectarian test may generally be appropriate, it should not be mechanically applied in every case.[19] As the Supreme Court cautioned in *Lynch*, 465 U.S. at 678, 104 S.Ct. at 1361–62, every Establishment Clause challenge calls for "line-drawing," and "no fixed, *per se* rule can be framed":

> The Establishment Clause like the Due Process Clauses is not a precise, detailed provision in a legal code capable of ready application.... The line between permissible relationships and those barred by the Clause can no more be straight and unwavering than due process can be defined in a single stroke or phrase or test. The Clause erects a "blurred, indistinct, and variable barrier depending on all the circumstances of a particular relationship."

*Id.* at 678–79, 104 S.Ct. at 1362 (quoting *Lemon*, 403 U.S. at 614, 91 S.Ct. at 2112). Given the possible foreign policy ramifications of invalidating grants under the ASHA program, it would be particularly inappropriate to adopt a mechanical approach in this case. Therefore, in our view, once it has been determined that a particular ASHA grantee is pervasively sectarian, the government should be permitted to demonstrate some compelling reason why the usually unacceptable risk attendant on funding such an institution should, in the particular case, be borne. For example, the fact that a particular grantee is, as a practical matter, the only channel for aid, or that a given country has no secular educational system at all, may warrant overriding the usual Establishment Clause presumption. The court would then scrutinize the manner in which the institution may use its grant in an attempt to ascertain whether, in reality, the grant would have the principal or primary effect of advancing religion.[20]

---

**19.** Justice Kennedy, writing for himself and Justice Scalia, has suggested that the "pervasively sectarian" inquiry is *never* appropriate in an as-applied challenge under the Establishment Clause:

> [W]here ... a statute provides that the benefits of a program are to be distributed in a neutral fashion to religious and nonreligious applicants alike, and the program withstands a facial challenge, it is not unconstitutional as applied solely by reason of the religious character of a specific recipient.

*Kendrick*, 487 U.S. at 624, 108 S.Ct. at 2582 (Kennedy, *J.*, concurring). Accordingly, because "the only purpose of further inquiring whether any particular grantee institution is pervasively sectarian is as a preliminary step to demonstrating that the funds are in fact being used to further religion.... [t]he question in an as-applied challenge is not whether the entity is of a religious character, but how it spends its grant." *Id.* at 624–25, 108 S.Ct. at 2582.

**20.** Professor Mansfield has suggested a similar approach. *See* Mansfield, *The Religion Clauses of the First Amendment and Foreign Relations*, 36 DePaul L.Rev. 1, 34 (1986). He first posits a situation involving United States aid to science education in Malaysia, where only religious-affiliated schools meet the standards of the program. In this situation, Mansfield argues, the government's foreign policy interest in the social stability of Southeast Asia, coupled with the importance of respect for the ways of foreign nations, should override the burden on persons

## CONCLUSION

For the reasons stated above, we conclude that appellants have standing as federal taxpayers to challenge grants made under the ASHA program; that their challenges do not present nonjusticiable political questions; and that ASHA grants are not immune from Establishment Clause strictures. The decision of the district court is therefore affirmed, and the case remanded for further proceedings consistent with this opinion.

WALKER, Circuit Judge, concurring:

While I do not concur in the majority's opinion in this case, I concur in the result. I believe that the Supreme Court's decisions in *Flast v. Cohen*, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968) and *Bowen v. Kendrick*, 487 U.S. 589, 108 S.Ct. 2562, 101 L.Ed.2d 520 (1988), and our decision in *Planned Parenthood Fed'n, Inc. v. AID*, 838 F.2d 649 (2d Cir.1988) require the result the majority reaches as to justiciability. My analysis of factors set forth in *United States v. Verdugo–Urquidez*, 494 U.S. 259, 110 S.Ct. 1056, 108 L.Ed.2d 222 (1990),[1] also leads me to concur in the majority's conclusion about the reach of the Establishment Clause in this case. However, I write separately to express my reservations about our Circuit's application of the political question doctrine as well as my concerns about the weight the majority gives to certain factors under the *Verdugo* analysis.

If we had not decided *Planned Parenthood*, which now is binding precedent in this Circuit, I would hold this action barred by the political question doctrine. The majority concludes that under *Planned Parenthood* which outlined for justiciability

purposes a distinction between "policy" and "implementation" of policy, this case fits into the latter category and is therefore justiciable. Although I agree that *Planned Parenthood* compels such a result, I believe that the seemingly facile distinction between "implementation" and "policy" arrived at in that case raises more questions than it answers. The critical importance of preserving the proper allocation of power among the three branches of government, *see, e.g., Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962), the deference due to the political branches in conducting our foreign affairs, *see, e.g., United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 319, 57 S.Ct. 216, 220–21, 81 L.Ed. 255 (1936), and a concern for the "possible consequences of judicial action," *Baker*, 369 U.S. at 211–12, 82 S.Ct. at 706–07, lead me to believe that the course on which we embarked in *Planned Parenthood* was an unwise one.

In the first place, the distinction between policy and implementation that we drew in *Planned Parenthood* may be so manipulable as to render it meaningless. For example, the Fifth Circuit in *Dickson v. Ford*, 521 F.2d 234 (5th Cir.1975) (per curiam), *cert. denied* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 360 (1976), found nonjusticiable an Establishment Clause challenge to the Emergency Security Assistance Act of 1973 and the Foreign Assistance Act of 1974, which authorized military and non-military aid to Israel. The majority distinguishes *Dickson* by maintaining that that case involved a direct challenge to the foreign policy itself, "not, as here and in *Planned Parenthood*, a challenge to one possible method of policy implementation." It is arguable, however, that the "policy" in *Dickson* was really to solidify a United

in the United States whose taxes will be used to support the program. *Id.* However, if the government chose to support the teaching of a moderate version of Islam rather than science education, the result would be different. According to Mansfield, neither the government's interest in thwarting Communism and Islamic fundamentalism, nor the importance of respect for other cultures, could outweigh the offense to the religion clauses posed by such a governmental endorsement of the doctrines of a particular religion. *Id.* at 34–35. Thus, under Mansfield's

analysis, the Government may aid pervasively sectarian institutions in foreign countries so long as the principal or primary effect of that aid is to further a secular goal.

1. Until we are told otherwise, I accept that *Verdugo* provides the most useful framework for examining the extraterritoriality of constitutional provisions, whether involving individual rights, as in that case, or limitations on Congressional power, as here.

States presence in the Middle East, or perhaps to improve relations with Israel, and that the challenged grants of military aid were merely means of "implementing" that "policy." In *Greenham Women Against Cruise Missiles v. Reagan*, 755 F.2d 34 (2d Cir.1985) (per curiam), we held nonjusticiable an attack on the deployment of cruise missiles at Greenham Common in Great Britain. There, the underlying decision to deploy the missiles at Greenham Common was "part of a broader plan to modernize the nuclear forces of the North Atlantic Treaty Organization ("NATO") and to provide a more adequate defense for Western Europe." *Greenham Women Against Cruise Missiles v. Reagan*, 591 F.Supp. 1332, 1333 (S.D.N.Y.1984) (footnote omitted). Was the decision to deploy cruise missiles in Greenham Common "policy" or rather a means of implementing the broader policy of defending Western Europe? As these cases indicate, it appears that one person's "implementation" can be another person's "policy." Indeed, if in the present case the State Department through AID were to articulate a *policy* of funding foreign schools regardless of religious affiliation, perhaps out of respect for the traditions of the recipient countries, would not that policy determination under our reasoning in *Planned Parenthood* render this case nonjusticiable?

Furthermore, the application of the policy/implementation distinction to this case suggests to me that the formalistic rubric we have grafted onto the political question doctrine may frustrate one of its underlying goals: as we described it in *Planned Parenthood*, the need for courts to refrain from adjudicating " 'the political and social wisdom of ... foreign policy.' " *Planned Parenthood*, 838 F.2d at 656 (quoting *DKT Memorial Fund, Ltd. v. AID*, 810 F.2d 1236, 1238 (D.C.Cir.1987)). The majority implicitly recognizes that there may be circumstances where policy and implementation converge to the point of being identical; for example, in this case, there may be countries where there are no alternatives to pervasively sectarian schools. In such circumstances, if the government wishes to carry out its foreign policy goals, it will

have only one means of implementation. The majority deals with this problem by providing that if such circumstances arise, the government may advance a compelling reason why it should be permitted to go forward. But it is not hard to see that such a scenario may require the district court to evaluate the government's foreign policy goals, and to balance these goals against the Establishment Clause concerns at stake in particular grants. Surely this will immerse the courts in the very evaluation of foreign policy that transgresses the separation of powers built into the Constitution and that underlies the political question doctrine in the first place. Making a distinction at the outset of a case between policy and implementation does little to ward off such a result, because the convergence of policy and implementation may only become apparent well after a court has made the political question determination and proceeded to the merits.

Finally, executive or congressional decisions about "implementation" can themselves be laden with "policy" determinations. How do we know, for example, what foreign policy considerations underlay AID's choice of a particular school in a particular country as a means of implementing the ASHA program? Nonetheless, these choices made by a political branch, which are often inextricably intertwined with policy concerns, appear to fall under the category of "implementation" according to *Planned Parenthood*, and are therefore justiciable. Although I thus feel compelled to concur in the majority's result based upon our prior decision in *Planned Parenthood*, I am deeply concerned that we are incrementally intruding into matters of foreign affairs committed to the political branches where courts do not belong.

I am further troubled by the majority's *Verdugo* analysis. While I agree with the conclusion that under the analytical framework set forth in *Verdugo*, the first amendment's Establishment Clause may have extraterritorial effect, the majority seriously minimizes the foreign policy concerns that must be taken into account in this analysis.

I nonetheless agree with the majority's result, principally for two reasons: first, I believe that the text of the first amendment's limitation on Congress' competency to act in regard to religion bears no construction that confines its operation to the United States; second, the history of the Establishment Clause,[2] at least that history as presented in Supreme Court precedents such as *Everson v. Board of Education,* 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947), strongly suggests that the Clause protects against not only the kind of governmental encroachment that might lead to the establishment of a national religion, but also against the taxation of citizens in order to support religion. *See id.* at 16, 67 S.Ct. at 511 ("[n]o tax in any amount ... can be levied to support any religious activities or institutions"). This taxation, of course, is not extraterritorial; it occurs in the United States.

Justice Rehnquist makes a compelling argument in his dissent in *Wallace v. Jaffree* that the Supreme Court, in *Everson* and subsequent cases, has been erroneous in its interpretation of the history of the Clause and its meaning as to taxation. *See Wallace v. Jaffree,* 472 U.S. 38, 104, 105 S.Ct. 2479, 2514, 86 L.Ed.2d 29 (1985) (Rehnquist, J., dissenting) (noting "the fallacy of the notion found in *Everson* that 'no tax in any amount' may be levied for religious activities in any form") (citation omitted). However, this Court is bound by *Everson* and its progeny, and therefore the "tax factor" in Supreme Court precedent, when coupled with the text of the first amendment, leads me to concur with the majority on the Establishment Clause issue.

---

**2.** I do not join in the majority's broad-scale attack on originalism in the context of this case. While a quest for original intent here need not be "slavish" and may present difficulties, a minimization of the role of history and original intent is unwarranted particularly when considering an Establishment Clause question. As Justice Rutledge explained in his noted dissent in *Everson v. Board of Education:* "No provision of the Constitution is more closely tied to or given content by its generating history than the religious clause of the First Amendment." 330 U.S. 1, 33, 67 S.Ct. 504, 520 (Rutledge, J., dissenting).