# Constitutionality of Awarding Historic Preservation Grants to Religious Properties

A court applying current precedent is most likely to conclude that the direct award of historic preservation grants to churches and other pervasively sectarian institutions violates the Establishment Clause of the Constitution.

October 31, 1995

MEMORANDUM OPINION FOR THE SOLICITOR
DEPARTMENT OF THE INTERIOR

At your request, we have reviewed your office's draft opinion regarding the permissibility under the Establishment Clause of awarding government historic preservation grants to churches and other religious properties.[1] In particular, and as we discussed earlier, we have considered whether the Supreme Court's recent decision in *Rosenberger v. Rector & Visitors*, 515 U.S. 819 (1995), directly addresses the particular question you have raised.

As discussed below, the *Rosenberger* decision, which deals with a form of government aid to religion significantly different from that at issue here, does not control the case you have presented. Accordingly, we have no occasion here to fully analyze the *Rosenberger* decision, nor to predict how it might apply in other contexts. Rather, our analysis is guided by Supreme Court case law developed prior to *Rosenberger*. We conclude that a reviewing court, applying current precedent, likely would hold that making historic preservation grants to churches and other pervasively sectarian properties is inconsistent with the Establishment Clause.

## 1. Background

Our understanding of the program in question, based primarily on the materials you have provided us, is as follows. Organizations are eligible for historic preservation grants, funded by the federal government and awarded directly by the states, if they are listed on the National Register. Listing on the National Register, in turn, depends on satisfaction of fairly detailed criteria measuring "significance in American history, architecture, archeology, engineering, and culture," including "integrity of location, design, setting, materials, workmanship, feeling, and association." *See* 36 C.F.R. § 60.4 (1995). A religious property qualifies for listing if it "deriv[es] primary significance from architectural or artistic distinction or historical importance." *Id.* Listing on the National Register is only a threshold condition of grant assistance; the states apparently make their own

---

[1] Draft Memorandum for Roger F. Kennedy, Director, National Park Service, from John D. Leshy, Solicitor, *Re: Historic Preservation Grants for Religious Properties* ("Draft Memo").

"determination[s] of needs and project worthiness in selecting projects to be funded from the many applications submitted."[2]

At least since 1981, grants have not been made available to active churches or houses of worship under the program.[3] Both the Reagan and the Bush Administrations took the position that direct financial support of active churches would be inappropriate in light of Establishment Clause concerns.[4] The question you have raised is whether that policy may be reversed. Specifically, you have asked whether historic preservation grants may be awarded directly to religious organizations for the preservation of buildings currently used for religious purposes such as worship and education.[5] Directly at issue appear to be grants for the preservation of active churches or, perhaps, of other religious facilities that would be considered "pervasively sectarian" under the Supreme Court's jurisprudence.[6]

## 2. Analysis

As your draft opinion recognizes, a series of Supreme Court cases decided prior to *Rosenberger* calls into considerable question any effort by the government to provide monetary assistance directly to pervasively sectarian institutions.[7] Because your draft opinion itself discusses this line of authority, we limit ourselves to a brief description of the two-part rule that has emerged to govern direct financial support of religious institutions.

First, though the government may include religious institutions that are not pervasively sectarian in neutral programs providing financial assistance, it must ensure that government grants are not used to fund "specifically religious activity" and are instead channeled exclusively to secular functions. As you note, the Supreme Court has applied this principle quite stringently in a line of closely analogous cases involving school construction and repair grants. In those cases, the Court upheld grants to non-pervasively sectarian religious schools only when the program in question expressly excluded from funding "any facility used or to be used for sectarian instruction or as a place for religious worship." *Tilton v. Richardson*, 403 U.S. 672, 675 (1971) (approving provision of federal construction grants to colleges and universities with religious affiliations).[8]

---

[2] Memorandum for Director, Heritage Conservation and Recreation Service, from Associate Solicitor, Conservation and Wildlife, *Re: Historic Preservation Grants for Renovation of Church Properties* at 1 (Mar. 6, 1979).

[3] Draft Memo at 1; Letter for the Honorable James G. Watt, Secretary of the Interior, from Frederick N. Khedouri, Associate Director, Office of Management and Budget (Dec. 14, 1981) ("Khedouri Letter").

[4] The Reagan Administration appears to have rested its position on a policy decision made in "the context of the legal issues surrounding church-state affairs." *See* Khedouri Letter at 1. The Bush Administration relied more expressly on the conclusion that direct grants to active churches would be unlawful under Supreme Court case law construing the Establishment Clause. *See* Letter for the Honorable Peter H. Kostmayer, House of Representatives, from Robert E. Grady, Associate Director, Office of Management and Budget (Mar. 28, 1991).

[5] Draft Memo at 2.

[6] *Id.* at 6 (assuming that most if not all potential grantees would be deemed "pervasively sectarian").

[7] *Id.* at 5.

[8] *See also Hunt v. McNair*, 413 U.S. 734, 736 (1973) (upholding state-financed construction of college and university facilities, subject to same restriction); *Roemer v. Maryland Pub. Works Bd.*, 426 U.S. 736, 740–41 (1976)

That the Court conceives of this restriction on use of public funds as both essential and rather sweeping is illustrated by the *Tilton* case, holding that the expiration of a restriction after twenty years violates the Establishment Clause: "If, at the end of 20 years, the building is, for example, converted into a chapel or otherwise used to promote religious interests, the original federal grant will in part have the effect of advancing religion." *Id.* at 683. The Court made the same point in *Nyquist*, invalidating maintenance and repair grants to nonpublic schools in part because they lacked "appropriate restrictions": "Nothing in the statute, for instance, bars a qualifying school from paying out of state funds the salaries of employees who maintain the school chapel, or the cost of renovating classrooms in which religion is taught, or the cost of heating and lighting those same facilities." 413 U.S. at 774. Importantly, the prohibition on public funding of facilities used for religious activity applies even where the government's purpose in funding those facilities is concededly secular and "entirely appropriate for governmental action." *Tilton*, 403 U.S. at 678–79; *see Nyquist*, 413 U.S. at 773–74.

The second part of the rule qualifies the first: with or without restrictions, the government may not provide monetary aid directly to "pervasively sectarian" institutions, defined as institutions in which "religion is so pervasive that a substantial portion of [their] functions are subsumed in the religious mission." *Hunt*, 413 U.S. at 743. The outer boundaries of the "pervasively sectarian" category are not well-defined, *see Bowen v. Kendrick*, 487 U.S. 589, 631 (1988) (Blackmun, J., dissenting), and the Supreme Court has used it most often — though not exclusively [9] — in connection with educational institutions. Nevertheless, we have no doubt that you are correct in assuming that most if not all active houses of worship would fall within this category.[10] Indeed, the notion that religion plays something less than a vital and pervasive role in an active church's mission might appear inconsistent with a proper respect for religious institutions as well as with common sense.

As the Court has explained, the reason for the prohibition on direct monetary grants to pervasively sectarian institutions is the unacceptable risk that where secular and religious functions are "inextricably intertwined," government aid, though designated for a secular purpose, will in fact advance the institution's religious mission. *Meek v. Pittenger*, 421 U.S. 349, 365–66 (1975) (invalidating provision to pervasively sectarian schools of instructional material "earmarked for secular purposes"); *Kendrick*, 487 U.S. at 610. Again, it is immaterial to this part of the Court's analysis that provision of assistance would serve a legitimate

---

(upholding provision of noncategorical state grants to private colleges and universities, where grants may not be used for "sectarian purposes"); *Committee for Pub. Educ. v. Nyquist*, 413 U.S. 756, 774 (1973) (invalidating state maintenance and repair grants for nonpublic elementary and secondary schools in part because they lack restrictions on use for religious purposes).

[9] At issue in *Bowen* were a broad range of social services organizations with religious affiliations. The Court concluded that the Establishment Clause prohibited those organizations that were "pervasively sectarian" from receiving federal grants under the Adolescent Family Life Act, 42 U.S.C. §§ 3007–3007–10. 487 U.S. at 620–21.

[10] Draft Memo at 6.

secular purpose, *see Meek*, 421 U.S. at 363; *Kendrick*, 487 U.S. at 602; what is critical is that the assistance also would have the effect of advancing religion because of the pervasively sectarian character of the recipients. *Meek*, 421 U.S. at 363. And even if it were possible, as a theoretical matter, to channel government funds exclusively to secular functions in such institutions, the degree and kind of governmental monitoring necessary to ensure compliance with the requisite funding restrictions would itself raise Establishment Clause problems. *Kendrick*, 487 U.S. at 616–17.

We think that these concerns would be implicated squarely were the government to provide churches and other pervasively sectarian facilities with historic preservation grants. The draft opinion suggests that such grants might be permissible if restricted to the preservation of "secular elements" of otherwise religious buildings — that is, if government assistance were used only for such purposes as exterior renovation, roof repair, and replacement of structurally necessary internal components.[11] What underlies the Court's decisions in this area, however, is an understanding that in the context of pervasively sectarian facilities, "secular elements" simply cannot be identified and separated from the overall religious mission. Indeed, renovation of active churches and other houses of worship appears to be a case in point. Though a structural element like a roof can be characterized as "secular" rather than "sectarian" in most contexts, the distinction cannot be maintained in any meaningful sense when the roof is a component part of an active church.

Moreover, even if such a distinction could be defended in the abstract, efforts by the government to identify those elements of a house of worship that do not have "direct religious import"[12] could well involve the kind of "monitoring for the subtle or overt presence of religious matter" prohibited by the Establishment Clause. *See Hernandez v. Commissioner*, 490 U.S. 680, 694 (1989). It is our understanding that even the most basic structural features of a church may carry symbolic religious import.[13] Determining whether that is the case in any given instance may require an inquiry into religious doctrine or belief that would impermissibly entangle the government in religious affairs. *See id.* at 696–97 ("[R]equiring the Government to distinguish between 'secular' and 'religious' benefits or services [provided by Church of Scientology auditing sessions] may be fraught with the sort of entanglement that the Constitution forbids.' "). In short,

---

[11] *Id.* at 3, 7.

[12] *Id.* at 3.

[13] "Besides individual ornaments and architectural features, the [church] structure, taken as a whole, can be a symbol of the entire religion:

'The visible church building was both a symbol and model for the invisible or "spiritual" church. . . .
The church was considered to be a tangible expression of a host of images and ideas expressed in the Bible. It was the body of Christ, a city of refuge, the New Jerusalem, God's presence among men.' "

Thomas Pak, Note, *Free Exercise, Free Expression, and Landmarks Preservation*, 91 Colum. L. Rev. 1813, 1841 (1991) (quoting Paul Clowney, & Tessa Clowney, Exploring Churches 65 (1982)).

we do not think that it is feasible, in theory or practice, to differentiate between religious and secular elements of active houses of worship.

This is, we note, the conclusion reached in a different context by the Washington Supreme Court in *First Covenant Church v. City of Seattle*, 840 P.2d 174 (Wash. 1992) (en banc). In holding that the Free Exercise Clause prohibited application of a landmark ordinance to restrict a church's ability to alter its exterior, the court relied in part on the inextricable link between the church's structure and its religious message: the "church building itself 'is an expression of Christian belief and message' and . . . conveying religious beliefs is part of the building's function. . . . The relationship between theological doctrine and architectural design is well recognized." *Id.* at 182. The court went on to reject an attempted separation of religious from secular elements, finding that the ordinance's exception for "alterations necessitated by changes in liturgy" was unworkably vague: "Would a wider door to permit access by handicapped parishioners comprise a liturgical change? Although . . . widening the door does not relate directly to the rites or procedures of worship in the church, it does facilitate the ability of disabled persons to participate in religious services and activities."*Id.* at 184 (quoting prior decision in *First Covenant Church v. City of Seattle*, 787 P.2d 1352, 1360 (Wash. 1990) (en banc)). Though we take no position on the ultimate decision in *First Covenant*,[14] we do think that the court's reasoning on this issue is persuasive.

There is one additional feature of the historic preservation grant program that bears emphasis here. In recent cases upholding the provision of certain benefits to religious groups or for religious expression, it has been important to the Court that the benefit in question is generally available to all interested parties, on a religion-neutral and near-automatic basis. *See Rosenberger*, 515. U.S. at 840–45 (subsidization of printing costs generally available to all student publications); *Capitol Square Review and Advisory Bd. v. Pinette*, 515 U.S. 753, 757–59, 763 (1995) (access to public square generally available for all displays); *Westside Community Bd. of Educ. v. Mergens*, 496 U.S. 226, 252 (1990) (O'Connor, J.) (access to school facilities available to all student clubs, with students free to organize additional clubs). Provision of benefits to religious groups or expression in this context, the Court has reasoned, is most unlikely to reflect or convey any endorsement of or preference for religion. *Id.; see Pinette*, 515 U.S. at 763–66. Historic preservation grants, by contrast, do not appear to be generally available in the same sense. Properties, including religious properties, qualify for initial listing on the Historic Register only if they meet subjective criteria pertaining to architectural and artistic distinction and historical importance. Once listed, prop-

---

[14] We note that at least one other court has upheld against a Free Exercise Clause challenge the application of a landmark restriction to prevent a church from erecting a commercial office tower on its property. *St. Bartholomew's Church v. City of New York*, 914 F.2d 348 (2d Cir. 1990), *cert. denied*, 499 U.S. 905 (1991). Because the church's claim in that case centered on lost revenue rather than on structural integrity, the court did not address the issues analyzed in First Covenant. *See First Covenant*, 840 P.2d at 181 (distinguishing *St. Bartholomew's*).

erties are eligible to compete for grants based on additional measures of "project worthiness" established by the states. Participation by pervasively sectarian institutions in this kind of competitive grant program raises special concerns, absent in cases like *Rosenberger, Pinette,* and *Mergens,* that application of necessarily subjective criteria may require or reflect governmental judgments about the relative value of religious enterprises.

We understand that the Second Circuit's decision in *Lamont v. Woods,* 948 F.2d 825 (2d Cir. 1991), suggests in dicta that the Establishment Clause prohibition on direct funding of pervasively sectarian institutions may admit of exceptions in certain cases. We do not believe it appropriate, however, to rely on that case here. First, as your draft opinion appears to recognize, the portion of *Lamont* at issue is at best in considerable tension, and at worst inconsistent, with governing Supreme Court precedent. Second, even if the standard advanced in *Lamont* could be defended, we are not convinced that it would apply in this context.

The *Lamont* court suggested that it might approve funding of a pervasively sectarian institution if (i) the government had a compelling interest in providing funds; and (ii) the court could assure itself that the grant would not in fact advance religion. 948 F.2d at 842. At issue in *Lamont* was assistance to pervasively sectarian schools abroad, with the stipulation that no government funds be used to "construct buildings or other facilities intended for worship or religious instruction." *Id.* at 828. For present purposes, we will assume with the *Lamont* court that a pervasively sectarian school's religious mission might not be advanced by funding of a separate facility, such as a gym, used only for secular purposes. Whether or not this is so, however, it simply does not follow that the government also may fund the preservation of facilities that *are* "intended for worship or religious instruction" without impermissibly advancing religion. Moreover, we hesitate to assume that a court would find the government's interest in historic preservation sufficiently "compelling" to trigger the *Lamont* analysis in the first instance. Again, we note that the court in *First Covenant* rejected such a claim: "[T]he City's interest in preservation of esthetic and historic structures is not compelling and it does not justify the infringement of *First Covenant*'s right to freely exercise religion. The possible loss of significant architectural elements is a price we must accept to guarantee the paramount right of religious freedom." 840 P.2d at 185.

Finally, as noted above, the Court's decision in *Rosenberger* does not address the issue posed by your inquiry to us. *Rosenberger* does, however, acknowledge the Establishment Clause principle against "direct money payments to sectarian institutions," citing most of the same cases we discuss here. 515 U.S. at 842. The Court goes on to approve assistance to a student religious publication on the grounds that the principle identified is not implicated: the program in question neither involves the payment of public funds directly to recipients nor includes religious institutions "in the usual sense of that term" among its beneficiaries.

*Id.* at 842–44. Indeed, the Court places special emphasis on the second factor as it applies to churches, carefully distinguishing the case before it from one involving direct or indirect public aid to a church. *Id.* at 844. *Rosenberger*, to be sure, emphasized the importance of neutrality in upholding governmental programs against Establishment Clause challenge, clarifying that the Establishment Clause does not ''justif[y], much less require[ ], a refusal to extend free speech rights to religious speakers who participate in broad-reaching government programs neutral in design.'' *Id.* at 839. Nevertheless, we do not believe that at the present time there is authority for a departure, in the context presented here, from the rule against providing funds directly to churches and other pervasively sectarian institutions.

As you know, the question of government aid to religious institutions is a very difficult one. The lines separating permissible from impermissible assistance are sometimes hard to discern, and, as *Rosenberger* indicates, the Supreme Court's jurisprudence in this area is still developing. We think, however, that a court applying current precedent is most likely to conclude that the direct award of historic preservation grants to churches and other pervasively sectarian institutions violates the Establishment Clause.

WALTER DELLINGER
*Assistant Attorney General*
*Office of Legal Counsel*